FILED
SCRANTON

JAN 3 1 2012

Per_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

Angela M. Brindle,                    :
                                      :
        Plaintiff                     :       No. 4:11-CV-00176
                                      :
    vs.                               :       (Complaint Filed 01/26/11)
                                      :
MICHAEL J. ASTRUE,                    :
COMMISSIONER OF SOCIAL                :       (Judge Nealon)
SECURITY,                             :
                                      :
        Defendant                     :

## MEMORANDUM

### January 31, 2011

## BACKGROUND:

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Angela M. Brindle's claim for supplemental security income benefits (SSI). For the reasons set forth below we will affirm the decision of the Commissioner.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Brindle was born in the United States on September 10, 1976[1]. Tr. 317 and

417.   Brindle is a high school graduate. Tr.  703.  Brindle has worked as a store

laborer and a kitchen helper; both are considered to be medium, unskilled jobs.[2]  Tr.

---

1. Brindle is presently 35 years old and is considered a "younger individual" under the Social Security regulations.  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

2 The terms sedentary, light and medium work are defined in the Social Security regulations as follows:

> (a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) Light work.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or    carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in  this category when it requires a good deal of    walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg  controls.    To    be considered capable of performing a    full or wide range of light work, you must have the ability to do substantially all of these activities.  If    someone can do light work, we determine that he or  she can also do sedentary work, unless there are additional limiting factors such as loss of fine   dexterity    or inability to sit for long periods of time.

> (c) Medium work.  Medium work involves lifting no more  than 50 pounds at a time with frequent lifting or    carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

2

433 and 720.  Records from the Social Security Administration reveal that Brindle

earned $37,012.81 between the years 1994 and 1999.  Tr. 357.  Brindle has not

worked since 1999.  Brindle's earnings by year are as follows:

|         |          |
|---------|----------|
| 1994    | $ 1,764.78 |
| 1995    | 2,327.63 |
| 1996    | 7,323.70 |
| 1997    | 12,792.25 |
| 1998    | 12,449.19 |
| 1999    | 355.19 |
| 2000-present | 0.00 |

Tr. 357.

The procedural history in this case is most unusual.  Brindle first filed an

application for Supplemental Security Income Benefits on January 3, 2003[3].  Tr. 93.

Her alleged impairments were obesity and cardiac arrhythmia.  She initially alleged

an onset date of birth (September 10, 1976), but she later amended her onset date to

July 5, 2005.  Tr. 492.  A hearing before Administrative Law Judge Wesner was

held, and ALJ Wesner denied her claim on November 14, 2005.  Tr. 95-100.  On

January 4, 2006, Brindle appealed Wesner's decision to the appeals council.  Before

the appeals council had made a decision, Brindle filed a second application for

---

20 C.F.R. §§ 404.1567 and 416.967.

3 Although the court is referring to this as Brindle's first application for benefits, there are references in the record to prior applications for benefits.

Supplemental Security Income Benefits on August 15, 2006, with an onset date of August 16, 2006. This is the application at issue in the instant memorandum. Her alleged impairments in this second application were atrial septal defect status post repair, hypertension, asthma, sleep apnea, obesity, diabetes mellitus, irritable bowel syndrome and depression.

On November 19, 2007, Administrative Law Judge Train denied Brindle's second application for benefits. Tr. 306-318. On November 27, 2007, Brindle appealed ALJ Train's decision to the appeals council. On January 3, 2008, the district court reversed and remanded the decision of ALJ Wesner. On April 23, 2009, Wesner issued a fully favorable decision for Brindle for a closed period of benefits beginning July 5, 2005 (her amended onset date) and ending August 15, 2006 (the day before the alleged onset date of her second application for benefits). Tr. 489-497. More than three years after she filed her appeal, the appeals council affirmed the decision of ALJ Train on December 16, 2010.

On January 26, 2011, Brindle filed a complaint in this court requesting that we reverse the decision of the Commissioner denying her supplemental security income benefits. The Commissioner filed an answer to the complaint and a copy of the administrative record on April 11, 2011. Brindle filed a brief on May 25, 2011.

4

On June 27, 2011, the Commissioner filed an opposition brief. The appeal[4] became ripe for disposition on July 5, 2011, when Brindle filed a reply brief.

**STANDARD OF REVIEW:**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as

---

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict created

by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which

evidence was accepted, which evidence was rejected, and the reasons for rejecting

certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore,

a court reviewing the decision of the Commissioner must scrutinize the record as a

whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v.

Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the

record. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an

obligation to develop the record in light of the non-adversarial nature of benefits

proceedings, regardless of whether the claimant is represented by counsel.");

Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787

F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001);

Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000);  see also Sims v. Apfel, 530 U.S.

103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and

develop the arguments both for and against granting benefits[.]").  If the record is

not adequately developed, remand for further proceedings is appropriate. Id.

**SEQUENTIAL EVALUATION PROCESS:**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating supplemental security income claims.  See 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1)

is engaging in substantial gainful activity,[5] (2) has an impairment that is severe or a

combination of impairments that is severe,[6] (3) has an impairment or combination of

impairments that meets or equals the requirements of a listed impairment,[7] (4) has

---

5. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 416.910.

6. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 416.945(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. §416.945(c).

7. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

9

the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[8]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**DISCUSSION:**

At step one, the administrative law judge found that Brindle had not engaged in substantial gainful activity since her application date, August 15, 2006. Tr. 311.

---

8. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

10

At step two, the administrative law judge found that Brindle has the following severe impairments: atrial septal defect status post repair, hypertension, asthma, sleep apnea, obesity, diabetes mellitus, irritable bowel syndrome and depression. Tr. 311.

At step three, the administrative law judge found that Brindle does not have an impairment or combination of impairments that meets or medically equals a listed impairment. Tr. 311.

The administrative law judge then found that Brindle has the residual functional capacity to

> [p]erform sedentary work except that she cannot lift more than 5 pounds, she must alternate sitting and standing ever 15-20 minutes, she is limited to walking 150 feet at a time, she is limited to simple repetitive (unskilled) work due to depression, anxiety, fatigue, and pain, and she needs to utilize the bathroom everyone to one and on-half hours.

Tr. 313.

Based on this residual functional capacity and the testimony of a vocational expert, the administrative law judge concluded at step five that Brindle is not disabled because "there are jobs that exist in significant numbers in the national economy that the claimant can perform." Tr. 317.

11

The administrative record in this case is 734 pages in length and we have thoroughly reviewed that record. Brindle's brief recites three alleged errors by the administrative law judge. First, Brindle argues that the administrative law judge erred by failing to accord appropriate weight to the opinions of the treating physicians. Second, Brindle argues that the administrative law judge erred by not finding that Brindle needs access to the restroom more frequently than hourly. Finally, Brindle argues that the administrative law judge erred by failing to consider the nonexertional limitations and effects of Brindle's obesity on her residual functional capacity. Brindle also suggests that the appropriate remedy in this case is reversal, as opposed to remand.

Before delving into the arguments raised in the briefing, it is important to understand Brindle's medical history.

On December 3, 1997, Brindle had an echocardiogram. It showed "right ventricular and right atrial enlargement and abnormal septal motion suggestive of right ventricular volume overload pattern." Tr. 258. "Would be suspicious of an

12

atrial septal defect[9]." Id.

As a result of the atrial septal defect, on July 7, 1998, Brindle underwent

surgery performed by Eduardo Jorge, M.D.  The surgery included Pericardial Patch;

Closure of Ostial Secundum Septal Atrial Defect; Insertion of Triple Lumen Central

Venous Pressure.

On August 3, 1998, Brindle saw Timothy P. Walsh, M.D., her cardiologist.  Dr.

Walsh wrote, in salient part.

> 21 year old female who has an ostium secundum atrial septal defect
> repaired by Dr. Jorge on the 7th of July.  Post operative course was only
> complicated by mild pulmonary congestion responding to prn diuretic
> therapy.  She is in the office today for her first post hospital follow-up.
> She has been up and walking, and from that standpoint seems to be doing
> well.   Still having some significant chest wall discomfort, and still with
> some pulmonary congestion, although this is slowly improving with
> time.
>                               *****
> Examination: General – obese [weight: 226 lbs]   young female in no
> acute distress.  Cardiovascular – Irregular rhythm.  I do not appreciate
> any murmur, and there is no friction rub noted.
>
>                               *****
> Her EKG today shows atrial flutter with a somewhat rapid ventricular

---

9 "Atrial septal defect (ASD) is a congenital heart defect in which the wall that
separates the upper heart chambers (atria) does not close completely."
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001210/ (Last accessed 1/26/11).

rate – rate of approximately 100 beats per minute, and nonspecific ST-T wave changes noted.

*****

Impression : This is a 21 year old female post ASD repair who has developed atrial flutter post operatively.   Because of this fact we will start her on Digoxin[10] .25 mg once a day along with low dose anticoagulation – Coumadin[11] 2.5 mg once a day.   She'll have weekly protimes done to regulate the Coumadin.   I will see her back in 4 weeks to re-evaluate the arrhythmia[12].   We may need to tentatively schedule her for elective cardioversion[13] if she has not converted by that time.   I'm

---

10 Digoxin helps make the heart beat stronger and with a more regular rhythm. Digoxin is used to treat congestive heart failure. It is also used to treat atrial fibrillation, a heart rhythm disorder of the atria (the upper chambers of the heart that allow blood to flow into the heart)

http://www.drugs.com/digoxin.html (Last accessed January 26, 2012).

11Coumadin  is used to prevent blood clots from forming or growing larger in your blood and blood vessels. It is prescribed for people with certain types of irregular heartbeat, people with prosthetic (replacement or mechanical) heart valves, and people who have suffered a heart attack.
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000634/ (Last accessed January 26, 2011).

12 An arrhythmia (ah-RITH-me-ah) is a problem with the rate or rhythm of the heartbeat. During an arrhythmia, the heart can beat too fast, too slow, or with an irregular rhythm.
http://www.nhlbi.nih.gov/health/health-topics/topics/arr/ (Last accessed January 26, 2012).

13 Electric cardioversion is used to treat any abnormal heart rhythm.
http://www.nlm.nih.gov/medlineplus/ency/article/007110.htm (last accessed January 26, 2012).

14

> also going to set her up for a follow-up echocardiogram to ensure that the
> atrial septal defect has been closed.

Tr. 256, (emphasis in original).

Brindle next saw Dr. Walsh on August 21, 1998.  He wrote, "21 year old

female recently status post an atrial septal defect, who on her first post hospital follow

up with me was in atrial flutter." Tr. 241.  "At that time we put her on Digoxin and

began anticoagulation." Id.  "Dr. Orange called today stating that she is still fairly

rapid with her atrial flutter, and thus I told him to add Cardizem[14] CD 120 mg a day."

Id.  "I tentatively was looking towards cardioverting[15] her sometime next week or the

following week." Id.

---

14 Cardizem is used to treat high blood pressure and to control angina (chest pain).
Diltiazem is in a class of medications called calcium-channel blockers. It works by
relaxing the blood vessels so the heart does not have to pump as hard. It also increases
the supply of blood and oxygen to the heart.
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000815/ (Last accessed January
26, 2012).

15 Electrical cardioversion is a procedure in which an electric current is used to reset
the heart's rhythm back to its regular pattern (normal sinus rhythm). The low-voltage
electric current enters the body through metal paddles or patches applied to the chest
wall.
http://www.webmd.com/heart-disease/atrial-fibrillation/electrical-cardioversion-for-
atrial-fibrillation (last accessed January 5, 2012).

15

Brindle saw Dr. Walsh again on August 28, 1998.  He wrote:

> 21 year old female who is status post an atrial septal defect repair who developed atrial flutter[16] post operatively.  She is on Dig[oxin] and Cardizem for rate control, and was placed on anticoagulation.  Anticoagulation status has been reasonably adequate.  She still, though, is fairly limited from a dyspnea[17] standpoint.  Also is having some localized chest wall pain. … Cardiovascular – Irregular rhythm.  I do not appreciate any murmur.  My plan at this time is to admit her next week for TEE and then directly proceed with cardioversion.  The longer we wait, the less likely I think we are going to be in being successful in converting her to sinus rhythm[18].

Tr. 259.

On December 21, 1998, a Holter monitor[19] was performed. Tr. 257.  The results

were normal. Id.

_____

16 Atrial flutter is an abnormality of the heart rhythm, resulting in a rapid and sometimes irregular heartbeat. Such abnormalities, whether in the rate or regularity of the heartbeat, are known as arrhythmias.
http://www.emedicinehealth.com/atrial_flutter/article_em.htm (Last accessed January 26, 2011).

17 Shortness of breath.

18 Normal beating of the heart.

19 A Holter monitor is a machine that continuously records the heart's rhythms. The monitor is usually worn for 24 - 48 hours during normal activity.
http://www.nlm.nih.gov/medlineplus/ency/article/003877.htm (Last accessed January 26, 2012).

16

On February 12, 1999, Brindle again saw Dr. Walsh. He wrote:

A 22 year old female who is approximately 8 months status post atrial septal defect repair to the pericardial patch. She has post operative paroxysmal atrial flutter and underwent cardioversion in September but since then she has really not responded very well. She has had problems with a persistent tachycardia[20], which is defied treatment and diagnoses. I thought initially we might just be dealing with deconditioning etc. through Cardiac Rehabilitation but this was unsuccessful in changing her well being and also changing her persistent tachycardia. She has been on combination Cardizem and Toprol therapy without good benefit. Weight of 248, which unfortunately is up another 6 lbs. since her last visit with me and is up 15 lbs. since her first office visit post operatively. Exam: Cardiovascular – Reveals a regular some[]what tachycardic rhythm with[]out murmur appreciated. There are no new lab studies to review. She did have a follow up [H]olter monitor in December. This showed sinus rhythm through[]out. Her rates though were averaging in the 95 beat per minute range and during normal activity were in the 105-120 beat per minute range increasing to a maximum of 150 beats per minute. She had no ventricular dysrhthmia. I am concerned that her resting tachycardia signifies more than just deconditioning and as I mentioned in my previous notes I wonder if she has a sinus node re-entrant tachycardia, which is some[]how related to her atrial scarring from her atrial septal defect repair. Id.

Tr. 261.

On February 12, 1999, Dr. Walsh sent a referral letter to John Zornosa, M.D.

In salient part, Dr. Walsh wrote:

---

20 Tachycardia is a faster than normal heart rate.
http://www.mayoclinic.com/health/tachycardia/DS00929 (Last accessed January 26, 2012).

17

I initially met [Brindle] in the spring of '98 when she had a transthoracic echocardiogram showing a fairly large atrial septal defect which was confirmed on transesophageal echocardiography. She underwent pericardial patch repair of this in July of 1998 by Dr. Eduardo Jorge. Her post operative reports was [sic] complicated by paroxysmal atrial flutter and we cardioverted her back to sinus rhythm in September. At that time I did perform a follow-up TEE, which revealed slight enlargement of the right heart chambers which is certainly not surprising post ASD repair. The _____ [sic] was well seen and was clearly intact. At that time I tried to get her to Cardiac Rehabilitation which she did comply with but did not get much benefit in terms of her exercise tolerance or improvement in her persistent tachycardia.

I have noted that she has been maintained on both beta blocker and calcium antagonist therapy pretty much since October without clear cut benefit. Since she is now greater than 6 months post-op I am concerned that we may be missing a problem like a persistent sinus node re-entrant tachycardia as a cause for her current problem. Thus I set her up for your evaluation.

Tr. 242.

On March 17, 1999, Brindle's surgeon, Dr. Jorge, sent a letter to Paul Orange, M.D., Brindle's primary care physician. Dr. Jorge wrote, in salient part,

Your patient, Angela Brindle, was seen in the office in regards to her sternal nonunion. As you know, Mrs. Brindle underwent an atrial-septal defect closure in July of 1998. She has done well, except for some arrhythmias, but she had recently begun to complain of some pain in her sternal incision. Mrs. Brindle actually works lifting heavy objects[21], but

_____

21 Counsel asserted that Brindle has not returned to work since 1998. Doc. 11 at 4.

the pain does not bother her during this. It is mostly point tenderness on palpation. On physical examination, her blood pressure is 120/70. The heart rate is 80 and regular. On palpation of the chest, the sternum does not move. However, there is point tenderness in the mid portion of the sternum in the area of one of the sterna wires. On evaluation of her CT scan, there is an obvious gap between the two sterna halves which most likely is filled with a fibrous nonunion. I indicated to Mrs. Brindle and her husband that the sterna halves are stable with the fibrous nonunion. I do not think she requires a sterna rewiring. However, if we remove the sterna wire in the mid portion of the sternum, it may relieve her pain. She understands that this is not a guarantee.

Tr. 262.

On April 4, 1999, Michael Smith, M.D., whom the court believes to be a

cardiologist, sent a letter to Dr. Walsh. The letter said, in part,

[Brindle] underwent successful DC cardioversion on 9/1/98. Since then she has had continued sensation of her heart racing and exercise intolerance despite cardiac rehab, low dose beta blockers and calcium channel blockers. The question was raised whether the patient has sinus node reentry tachycardia as a cause of her symptoms.

The patient relates that she had been feeling well prior to her surgery. In fact, in high school she was able to run six miles a day. Over the last two years she has gained at least 100 lbs. An echocardiogram last spring confirmed an atrial septal defect and repair was recommended. On September 1 you performed a transespohageal echocardiogram. This

---

However, this note about lifting heavy objects in 1999 seems to indicate that Brindle worked at some point after her surgery. The type of work described by the physician is consistent with her past relevant work. Brindle's social security records do show income during 1999. Tr. 307, 433, 720.

19

revealed an intact intra-atrial septum. The right heart chambers were mildly dilated with preserved right ventricular function. There was no tricuspid regurgitation. There was minimum mitral regurgitation. There was normal LV function.

The patient's complaints consist of a sharp pain in the lower part of her sterna incision.. . .She notes that her heart races while she is at rest and more so when she exerts herself. She becomes short of breath walking up one flight of stairs or walking two blocks. Rarely does she feel short of breath when she is lying flat.

The patient has had two Holter monitors performed. The first was on 9/30/98. This revealed sinus rhythm with rates averaging 95 to 105 bmp. The maximum rate was 150 bpm. There were rare ventricular premature contractions. No supraventricular dysrhythmias were noted. Her symptoms of palpitations were associated with sinus tachycardia, rates 110 to 120 bpm. She had a second Holter monitor performed on 12/21/98. This revealed heart rates ranging from 75 to 157. There were 4 VPC's and 15 APC's. No diary was returned.

Physical examination: She is an obese young woman...Her weight is 245 lbs. She is 5'9. Her blood pressure in her right arm is 128/80 and in her left arm is 122/80. Her pulse is 108 and regular. Respiratory rate is 16/minute. Oral mucosa is moist and pink. There is no thryomegaly. Her carotid upstrokes are 2+ without bruits. Her chest is clear. Heart exam reveals a fast rhythm. There is no murmur, gallop or click. Her sterna incision appears intact. There is no clicking on palpation. There is no fluctuance palpated. Her abdomen is obese without heptamegaly. The extremities reveal no clubbing or edema. An electrocardiogram was performed. This reveals sinus rhythm, rate 108 bpm. There is a small RSR prime in V1 suggesting right ventricular conduction delay. The P waves have normal morphology and axis. There is minimal nonspecific J point elevation in leads V3-V6.

Impression: Mrs. Brindle is a 22 year old female who is approximately eight months status post atrial septal repair for ASD. She did have an episode of atrial flutter but was successfully cardioverted. The patient has had continued symptoms of palpitations, dyspenea on exertion and exercise intolerance due to persistent sinus tachycardia. The question has been raised whether she has sinus node reentry tachycardia. Usually this is preceded by an atrial premature contraction which in turn induces a supraventricular tachycardia. There has been no evidence of this on her Holter monitors. She has had surgery on her atrium and could develop an intra-atrial reentry tachycardia; however, I would expect the P waves to be a different morphology and also this should be induced by atrial premature contractions. It is most likely that the patient has sinus tachycardia from either a secondary cause or has developed inappropriate sinus tachycardia. I reviewed her thyroid studies from 11/18/98 which are essentially normal. She give no symptoms of fevers or chills. She does have continued incision pain. I do not see any signs of infection; however, sterna osteomyelitis should be ruled out with a CBC and sedimentation rate. She gives no symptoms to suggest chronic DVT or recurrent pulmonary emboli as a cause of her symptoms. There was no evidence for pulmonary hyptertention on her TEE. She does have various chest pains. There is nonspecific ST segment elevation and it is possible that she may have some residual pericarditis from her surgery. She may also be developing a post-pericardiotomy syndrome.
I have asked her to return in two weeks to check her progress. . . I wonder if she may have Cushing's disease[22].

Tr. 244-246.

Brindle moved to Florida for a brief period. The records from the Volusia

---

22 Cushing's disease is a condition in which the pituitary gland releases too much adrenocorticotropic hormone (ACTH).
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001388/ (Last accessed January 30, 2012).

County Health Department, which are mostly illegible, show on July 20, 2002, "ASD repair in 1998 – [illegible] mitral valve did not replace it (may need to be replaced about age 30)." Tr. 197.

On March 13, 2003, Dr. Orange wrote a "To Whom It May Concern," letter, stating, "Angela Brindle has the diagnosis of: Atrial Septal Defect Repair, Asthma Reconditioning, Hypertension, Hypercholesterolemia, Oxogenous Obesity, and is unable to work at the present time."   Tr. 174.

Brindle had a chest X-ray on April 14, 2003 due to her shortness of breath. Tr. 217. The reading physician wrote, "Impression: No active lung disease." Id.

On April 25, 2003, Brindle underwent a Myocardial perfusion spect scan with ejection fraction.[23]   The reading physician wrote "Impression: No definite evidence

---

23 Cardiac SPECT (single photon emission computed tomography) scans — also called myocardial perfusion imaging — are non-invasive tests that are used to assess the heart's structure and function.

SPECT scans use small amounts of radioactive substances that are injected into a vein and special cameras to produce images of the heart. Using these pictures, a computer images that are used to measure blood flow through the heart and to detect areas of abnormal heart muscle.
http://wo-pub2.med.cornell.edu/cgi-bin/WebObjects/PublicA.woa/wa/viewService?servicesID=705&website=wmc+cardio (Last accessed January 30, 2012).

for stress-induced ischemia." Tr. 216.  "Left ventricular ejection fraction[24] of 61%."

Id.

On August 3, 2003, Brindle underwent an Echocardiogram Doppler[25] read by

Gary D. Hecht, M.D. Tr. 198 and 211.  Dr. Hecht's findings were as follows:

1. Left ventricular systolic function appears to be normal with approximate ejection fraction of 55% to 60% with no definite wall motion abnormalities appreciated.
2. No significant left ventricular hypertrophy seen.
3. Left ventricle measures normal in size and there may be mild enlargement of the left atrium. The right-sided cardiac chambers appear to be within normal limits or may be at most only mildly enlarged in size.
4. No significant aortic stenosis nor mitral stenosis seen.
5. No definite pathologic mitral valve prolapsed appreciated.
6. No significant pericardial effusion present.
7. There is seen some increased echo density along the atrial septum which probably corresponds to surgical repair of an atrial septal defect which is apparently reported as per the available history notes.
8. The Doppler examination demonstrates only minimal mitral and tricuspid regurgitation present. This Doppler examination does not demonstrate any definite shunt or flow across the atrial septum.  Certainly, however, if clinically

---

24 Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts.  A normal LV ejection fraction is 55 to 70 percent. http://www.mayoclinic.com/health/ejection-fraction/AN00360 (Last Accessed January 30, 2012).

25 An echocardiogram is a test that uses sound waves to create a moving picture of the heart.  An echocardiogram allows doctors to see the heart beating, and to see the heart valves and other structures of the heart. http://www.nlm.nih.gov/medlineplus/ency/article/003869.htm (Last accessed January 30, 2012).

suspected or indicated, may consider transesophageal echocardiogram or bubble or contrast study if clinically indicated.

Tr. 198 and 211.

On April 24, 2004, Michael Brown, M.D. performed a consultative medical examination and completed a Medical Source Statement on behalf of the Social Security Administration. Tr. 224-232. The salient portions of the consultative exam are as follows:

> She has not had any need for nitroglycerin since she was in the hospital in 1998 and has been taking pain medications for sharp pains that developed in the front of her chest periodically that go away within a few seconds and there is no radiation to other parts of her body. All these sharp pains are unrelated to activities and come along without warning. She has gained approximately 50 to 70 pounds since she was last seen in 2001 time frame. Weight is 290 pounds. Blood pressure is 122/80. Pulse is 84. Respirations are 16. Chest revealed no deformity. Heart was regular rate and regular rhythm without murmurs or gallops. There was difficulty hearing the sounds of the heart simply because of the obesity, however. Lungs indicated faint wheezes bilaterally in the expiratory phase of breathing. Normal excursions were present. Otherwise, no rales were heard. The patient appeared to be slightly depressed []. She has a history of heart surgery which seems to have left her with no significant sequelae at this point. I have no information, however, on echocardiograms or her medical stress test that was done previously in the Florida area. I would likewise think that her ejection factions are probably normal. There are no evidences of heart failure on examination today and the patient has no history that suggests a true angina. Most of her chest pains are probably musculoskeletal in nature.

24

Her dyspenea is probably related to her obesity and no signs of congestive heart failure at this time. No signs of tachycardia are present at this time and no specific problems with dizziness or vertigo were present today. Her blood pressure problems are well maintained with her present pressure at 122/80. Prognosis is poor in regard to this individual not doing well with maintaining her weight. Even though she claims she is on a diet restriction at this time, she obviously is overeating and is probably not going to exercise. Someone needs to speak to her frankly about the likelihood of early demise before she turns 45 if she does not start losing weight because of her obesity problems. All of the present health concerns are probably manageable with adequate medication. However, the patient is probably unwilling to lose weight at this time. This also indicates the need for possibility of stomach surgery such as a stapling process to help her lose weight if she is amenable to that.

Tr. 224-228. Dr. Brown completed the Medical Source Statement, writing in

his findings as to Brindle's abilities. He wrote, lifting – frequently 2-3 pounds,

occasionally up to 25 pounds." Tr. 230. "Carrying – frequently 2-3 pounds,

occasionally up to 20 pounds." Id. The supportive medical findings on which

he based his reasoning for these limitations are "obesity and asthma." Id. As

for standing and walking, he limited her to four hours in an 8-hour work day,

and sitting for six hours. The supportive medical findings on which he based his

reasoning for these limitations is "Leg swelling – edema." Id. "Pushing and

pulling – unlimited." Id. He wrote that she could only occasionally perform

bending, kneeling and balancing; and never stoop, crouch, or climb due to

25

"obesity and asthma." Tr. 231.   He found that she had no limitations with

regards to reaching, handling, fingering, feeling, seeing, hearing, speaking,

tasting, smelling or continence.  Id.  He wrote that poor ventilation, temperature

extremes and humidity "affects asthma."  Id.

On May 4, 2004, a physician, who did not examine Brindle, completed a

Residual Functional Capacity Assessment on behalf of the Social Security

Administration.  Tr. 233-240.  The physician wrote that Brindle is able to occasionally

lift up to 50 pounds.  Tr. 234. She can frequently lift or carry 25 pounds.  Id.  The

physician wrote that she can stand or walk for about 6 hours in an 8-hour work day.

Id.  Sit for about 6 hours in an 8-hour work day.  Id.  Unlimited ability to push and/or

pull.  Id.  No postural limitations (climbing, balancing, stooping, kneeling, crouching

and crawling).  Tr. 235.   No manipulative limitations (reaching, handling, fingering

and feeling).  Tr. 236.   No visual limitations.  No communicative limitations.  Tr.

237.   The physician also wrote that Brindle should avoid concentrated exposure to

extreme cold, extreme heat, wetness, humidity, fumes, odors, gases, poor ventilation,

etc. due to her history of asthma.  Id.   When asked about symptoms, the physician

26

wrote "The claimant alleges pain which is not attributable to a [illegible.]26" Tr. 238.

On December 30, 2004, Thach N. Nyguen, a cardiologist, sent a letter to Dr. Orange. Dr. Nyguen wrote, in salient part, "Cardiac examination: regular and there is a grade 1/6 systolic ejection murmur with no gallop." Tr. 609. "Angela has frequent palpitations." Id. "I am concerned about the possibility of recurrent atrial fibrillation, PAC's or PVC's." Id. "I have put a 24-hour Holter monitor on her to see whether there are any significant arrhythmia." Id.

On January 10, 2005, Brindle had a Holter Monitor attached. The reading physician wrote, "[c]onclusion: 1. Relatively unremarkable Holter monitor in a patient who reported numerous potential cardiac symptoms." Tr. 608. As a result, on January 20, 2005, Dr. Walsh sent a letter to Dr. Orange, which stated, in part, you should have received a copy of the Holter monitor that was done because of her palpitations." Tr. 607. "As you can see, there were no associated arrhythmias with her multiple symptomatic complaints." Id.

On February 14, 2005, Brindle underwent another Echocardiogram. Tr. 605-606. It was ordered by Dr. Walsh, and read by William B. Bachinsky, M.D., FACC,

---

26 We believe the illegible writing says "MDI" which we believe may be shorthand for "medically determinable impairment."

who wrote:

> Impression:
> 1. Normal LV size and function.
> 2. No overt valvular abnormalities.
> 3. Status post ASD repair, probable intact atrial septum. If clinically indicated, would consider bubble study or TEE to better delineate the atrial septum.

Tr. 606.

On March 1, 2005, Dr. Walsh wrote a "To Whom It May Concern" letter. He wrote, in salient part, that "[Brindle] is always going to have periodic cardiovascular follow up because of her history of congenital heart disease and also due to the fact that she has atrial arrhythmias and hypertension." Tr. 265.

On March 11, 2005 Dr. Orange wrote a "To Whom It May Concern" letter. He wrote, "Mrs. Angela Brindle has the following medical diagnosis: atrial septal defect repair, asthma, hypertension, hypercholesterolemia, atrial arrhythmias, chest pain with any activity, and exogenous obesity." Tr. 267 "Angela had surgical repair of an atrial septal defect in 1998." Id. "She has also undergone cardioversion for atrial arrhythmias in 1998." Id. "Due to these previous problems as well as hypertension, she needs routine follow up appointments with her cardiologist and her primary care physician." Id. "Angela has been to reconditioning classes but due to her bouts of

28

tachycardia, has had to stop attending and have her medications adjusted." Id.

"Angela is unable to work at the present time, and her diagnosis for work in the future

is not an option." Id.

On May 1, 2005, Dr. Walsh wrote a follow up letter. He wrote, in salient part,

that she "has a grade 1/6 systolic ejection murmur, atrial-arrhythmias, hypertention,

asthma, hypercholesterolemia, tachycardia, exogenous obesity[27], chest pain and a

history of congenital heart disease." Tr. 266. "Due to her extensive and ongoing

heart conditions, she has been and is still unable to work." Id. "This assessment is

based upon her physical examinations, medical history and appropriate tests and

procedures." Id.

On May 10, 2005, Dr. Orange wrote a follow up letter. He wrote, "[i]n addition

to the multiple conditions stated in a previous letter, Mrs. Brindle has numerous

limitations." Tr. 268. "Her cardiac arrhythmia's are causing her to have dizziness,

anxiety, marked fatigue, stress, exhaustion & near blackouts." Id. "She is unable to

concentrate and has become depressed." Id. "She is also unable to sleep through the

---

27 "Obesity caused by overeating."
http://dictionary.reference.com/browse/exogenous+obesity (last accessed January 10,
2012).

night, which requires her to take naps throughout the day." Id.  "She is unable to sit

or stand more than 15 to 20 minutes, is unable to walk more than 150 feet and is

unable to lift more than 5 (five) pounds at any time." Id.  "None of these activities

can be done frequently." Id.  "She also suffers from marked unrelieved pain in spite

of medications such as, (Percocet, etc.)." Id.   "In view of these limitations, I have

concluded that since 1998[,] Mrs. Brindle has been unable to do any substantial

work." Id.

On June 14, 2005  Dr. Orange wrote another "To Whom It May Concern"
letter.  He wrote, in salient part,

Mrs. Brindle was seen in my office [today]. . .

In spite of medications. . . her blood pressure continues to elevate, and as
a result she passes out.  Her cardiac arrhythmia's are causing her to have
dizziness, anxiety, market fatigue, exhaustion, stress and near blackouts...

I believe her arterial fibrillation is causing numbness in her limbs, and
her shortness of breath from a lack of oxygen being carried through the
blood stream to the appropriate parts of the body.

She is unable to sit or stand more than 15 to 20 minutes, is unable to
walk more than 150 feet, and is unable to lift more than 5 (five) pounds
at any time.  These restrictions are due to her intolerance for pain, her
inability to breathe without difficulty, her lack of mobility, and stress
than these activities put on her heart.

In view of these limitations, I conclude that since 1998 Mrs. Brindle has

been unable to do any substantial work.

Tr. 272.

On July 5, 2005, Dr. Nguyen wrote a  "To Whom It May Concern Letter.
Tr. 271

It was a pleasure seeing Angela on 7/5/05

She has been under a lot of stress. She has been noticing a lot of
palpitations occurring daily.  She is also experiencing shortness of
breath[], and numbness of her extremities.  I am concerned these are
signs of a recurrent problem with paroxysmal atrial fibrillation, which
requires cardioversion.

I evaluated her with an echocardiogram, showing signs of pulmonary
hypertension from the left ventricular function and significant
arrhythmia.

Her physical exam shows obesity, elevated heart rate and blood pressure,
along with her cholesterol levels.  She also has great amounts of fluid
retention, which limits her mobility.  Mrs. Brindle's prothrombin time is
also fluctuating putting her at high risk for blood clots to form, putting
her at a higher risk for stroke and/or heart attack.

Mrs. Brindle is unable to concentrate, is fatigued and exhausted all the
time.  I have put her on several restrictions, which she is to follow due to
her cardiac function, latest exam, and laboratory work.

I have concluded that she can[]not respond appropriately to supervision,
co-workers, and work pressures in a work setting.  Therefore, she is
unable to do any substantial work.

Tr. 271.

31

On August 30, 2005, Dr. Brown completed a Medical Source Statement of Claimant's Ability.  On the form the Medical Source Statement of Claimant's Ability Form he wrote that Brindle has the ability to frequently lift and/or carry 2-3 pounds and occasionally lift and/or carry 20 pounds.  Tr. 280.  In support of his conclusion, he wrote "fatigue due to atrial arrhythmia, obesity, dependent edema."  Id.  He wrote that she could stand and walk for four hours in an eight hour workday.  Id.  He wrote that she had no limitations with sitting, pushing and pulling or environmental restrictions.  Tr. 280-81.  Dr. Brown wrote that Brindle could occasionally bend, kneel and stoop; but that she could never crouch, balance or climb.  Tr. 281.

On September 3, 2005,  Brindle had another consultative exam with Dr. Brown. He wrote, in salient part,

> This is a 28-year-old female who we have seen on two occasions in the past for Social Security since November 2001. . . She had no significant useage of nitroglycerin in the time interval from 1999 up until the present. . . Her blood pressure has been under excellent control most recently and she has not required any procedures for tachycardia circumstances.   To my knowledge, she has not had any Holter monitoring done recently but did have an echocardiogram done this year. . . Her family doctor placed her on some restrictions related to standing and sitting time frames and also as far as lifting...

\*\*\*\*\*

Current medications are metoprolog, lisinopril, Lescol, hydrochlorothiazide, albuterol inhaler, Ortho-Cyclen, Fergon, iron supplement, Ecotrin, Centrum vitamins, vitamin C, E and B supplements.

\*\*\*\*\*

She had occasionally passed out and had a notice of occasional problems getting lost while driving.

\*\*\*\*\*

Height was 66 inches. Weight was 283-1/2 pounds. Blood pressure was 118/62. Pulse was 82, regular and controlled. Respirations were 16 and nonlabored.

\*\*\*\*\*

Heart: Regular rate and regular rhythm. No specific premature beats at this time and no irregularities otherwise. No S4 gallops, No particular murmurs were heard at this time. No rubs were heard.

\*\*\*\*\*

Conclusions: The patient has made slight progress as far her weight management since we saw her in 2004. She continues to became [sic] symptomatic from time to time with walking up and down stairs and walking more than 150 feet becoming short of breath. It is hard to understand from a physician's standpoint how she can be an active person up until 1998, and then have surgery that almost looks like to be [sic] postoperative handicap relative to her heart when the heart function should have improved substantially. The information concerning arrhythmias is not well known since she has not had any recent Holter monitors and no specific treatments for tachycardias in the hospital setting to verify what may actually be her symptoms and what those symptoms are from. The patient has obvious increased risks due to

33

hypercholesterolemia and her obesity aspects. She has the possibility of periodic atrial arrhythmias and some poor sleep patterns noted in our discussion today. Her fatigue may be partly due to a difficulty with sleep and side effects from medications since we do not have further information to go on.

*****

Prognosis: Prognosis is fair in this individual in that she will continue to have some difficulties, which may be improved if she goes on [a] substantial weight loss program. If she could withstand the surgical procedure for weight loss in the future, she may actually improve her chances of long-term survival. Otherwise, she runs a high risk of early demise.

Tr. 274-279.

On January 25, 2006, Dr. Orange wrote another "To Whom It May Concern" letter, stating, "[a]fter appropriate testing, results indicated Congestive Heart Failure, and Peripheral Artery Disease present." Tr. 285. . . . "The patient is on restrictions and has been instructed to eliminate stress." Id. "Mrs. Brindle has been scheduled a referral appointment with Moffit Heart and Vascluar pending valve surgery." Id. "In view of her past and present conditions, I conclude Mrs. Brindle has been unable to do any substantial work since 1998." Id.

On July 18, 2006, Dr. Walsh wrote a letter to Dr. Orange. It read, in part, "Mrs. Angela Brindle was seen. . . on July 28, 2006 for clinical re-assessment of her

34

cardiovascular issues." Tr. 284. . . . "At this office visit, examination demonstrates a

systolic murmur." Id.   "She is also bothered by fluid retention." Id.   "I am surprised

by how large Angela has become." Id.   "She is up approximately 50 or 60 pounds

since her last visit." Id.   . . . "Her obesity has become a big health issue, which I

think is contributed to obstructive sleep apnea, along with her continued health

issues." Id.

On August 22, 2006, Dr. Walsh wrote a "To Whom It May Concern" letter.  It

stated,

> Mrs. Angela M. Brindle was seen today for follow up to her (OSA) sleep
> study.   Results indicate presence of sleep apnea and treatment was
> advised.  She will be refereed  [sic] to a respiratory therapist, and ordered
> in home care equipment set up.
>
> Mrs. Brindle is at risk for irregular heart rhythms, high blood pressures,
> heart attack and stroke if her O.S.A. isn't treated properly.  This also puts
> a strain on the heart and can lead to a number of serious health
> conditions.
>
> She has also been instructed to follow her current restrictions of no
> sitting or standing more than 15 to 20 minutes, and no walking more than
> 150 feet and can[]not lift more than 5 pounds at a anytime.  Mrs. Brindle
> was given a parking place card to help accommodate these restrictions.
> In coming weeks follow up assessments will be made accordingly after
> further evaluation.
>
> I conclude, Mrs. Brindle is unable to do any substantial work since 1998.

Tr. 283.

On May 24, 2006, Dr. Orange wrote another "To Whom It May Concern

Letter."  It stated, "Mrs. Brindle was seen in my office on 5/12/06, following

treatment for Pulmonary Embolism." Tr. 287. "in addition to her serious problems

that continue to exist, she has had to make additions to her medicines, and has to

follow strict restrictions." Id. "Patient has been scheduled for laboratory work, x-ray

and exam in the coming weeks." Id. "In viewing her past and present conditions,

Mrs. Brindle is unable to do any substantial work." Id.

On June 8, 2006, Dr. Orange wrote a "To Whom It May Concern Letter." It

read, in part "Mrs. Brindle was seen on 06-06-06 in out[]patient services to remove

fluid from the heart." Tr. 288. "After reviewing the report, Mrs. Brindle is advised to

continue current medications with additional blood thinning medications, due to high

risk of embolism." Id. . . . "Mrs. Brindle is unable to do any substantial work." Id.

On November 9, 2006,  Candelaria Legaspi, M.D., completed a Physical

Residual Functional Capacity Assessment on behalf of the Social Security

Administration.  Tr. 654-660.  Dr. Legaspi wrote that Brindle could occasionally lift

and/or carry 20 pounds and that she could frequently lift and/or carry 10 pounds.  Tr.

36

655. Dr. Legaspi wrote that Brindle could stand and/or walk for about 6 hours in an 8-hour workday and sit for about 6 hours as well. Id. She wrote that Brindle's ability to push and/or pull is unlimited. Id. She wrote that Brindle has no postural, visual, communicative, environmental or manipulative limitations. Tr. 656-657. In conclusion, Dr. Legaspi wrote:

> ADLs as noted. She does not do much of anything, family members doing work. She has received various forms of treatment for the alleged symptoms. The record reveals that the treatment has generally been successful in controlling those symptoms. Furthermore, she has been prescribed, and has taken, appropriate medications for the alleged impairments.
>
> The medical records reveal that the medications have been relatively effective in controlling her symptoms. She has not been prescribed narcotic medication for the pain. No medication for pain.
>
> Based on total evidence on file [Brindle] is capable of light work.

Tr. 660

> On July 18, 2007, Dr. Orange wrote a letter to Dr. Walsh. It stated, in part,
>
>  Angela Brindle was in our Chambersburg office July 18, 2077, for one-year reassessment. . .
>
> Unfortunately her major health issue has been her gradually increasing weight. She has now developed noninsulin dependent diabetes mellitus and last year she [developed sleep apnea]. . . .

37

***** 

This is a 30-year-old female who is now almost 10 years status post atrial septal defect repair. From that standpoint I think she will continue to do well. She has not had any documentation of recurrence of atrial arrhythmias although given her obesity and sleep apnea, that is still a potential problem down the road.

I do not suggest any specific changes in her medical regimen today. I do not believe she requires any specialized testing this year. I have offered her a referral to the diabetic education specialist here . . .

Tr. 380-381.

On February 15, 2008, ALJ Wesner sent Medical Expert Interrogatories to Brad

Rothkopf, M.D., a cardiologist. Tr. 383-386. When asked if Brindle's hyptertensive

cardiovascular disease and hypertension meet a listing, Dr. Rothkopf wrote "No:

hypertension is [illegible] end organ disease, [illegible] to the neck, brain, eyes or

kidneys." Tr. 383. "The 2, 4, 6 [illegible] listings are not met or equaled." Id.

"There is also the repaired ASD, with one documented episode of atrial flutter after

the surgery, but no clear evidence of ongoing [illegible]." Id. "There is no nonunion

of the sternum." Id. "She appears to have morbid obesity, & more recently has

developed diabetes mellitus." Id. "She has sleep apnea, & thus is probably being

made worse by her weight." Id. "No information/testing [illegible] her [history] of

asthma." Id.   When asked to answer if her impairment(s) equaled a listing, Dr.

Rothkopf wrote "no" and referenced his previous answer.   Tr. 384.   When asked "Do

you agree with the opinion of Claimant's treating cardiologist, Dr. Nguyen, on July 5,

2005 [] that claimant would not be able to respond appropriately to work pressures in

a work setting," Dr. Rothkopf wrote "No, not based on physical problem alone,

although she would be physically limited." Tr. 385.   When asked if it is reasonably

consistent with Brindle's sleep apnea for her to need to nap for a couple of hours a

day, Dr. Rothkopf wrote "Yes, if not adequately treated by CPAP/BPAP." Tr. 385.   In

response to a question asking if Brindle's pain or fatigue would interfere with the

attention and concentration needed to perform simple work tasks, Dr. Rothkopf wrote

"unable to evaluate." Id.   When asked if Brindle's assertion that she urinates every

30-45 minutes due to her diuretic medication, HCTZ, is reasonably consistent with

her medical condition and medication, Dr. Rothkopf wrote "This could be treated if it

was a problem." Id.   When asked if Mrs. Brindle's fluid retention would necessitate

her to have her feet elevated with prolonged sitting, Dr. Rothkopf wrote "not

necessarily, is she wearing [illegible] if she has enough fluid to need to be

[illegible]?" Tr. 386.   Dr. Rothkopf wrote that he was not able to accurately estimate

39

how often Mrs. Brindle would likely be absent from work as a result of her

impairments.  Id.  Finally, Dr. Rothkopf wrote that Brindle is capable of full-time

work, "sedentary, temperate, uncontaminated environment, not high steps."  Id.

On October 28, 2008, Dr. Walsh sent a letter to Dr. Orange, which reads, in part

Mrs. Brindle was in our Chambersburg office for her one year reassessment.  She is 32 years old and is now ten years status post atrial septal defect repair, which was then followed by a brief episode of atrial flutter necessitating cardioversion back in September of 1998.  Since that time, she has done well although continues to battle with exogenous obesity.

*****

Current medications:
1.  Metoprolol 50 mg twice a day.
2.  Lisinopril 10 mg a day.
3.  Lescol 80 mg a  day.
4.  Hydrochlorothiazide 25 mg a day.
5.  Asprin.
6.  Albuterol as needed.
7.  Birth control pills.
8.  Advair metered dose inhaler.
9.  Metformin 500 mg a  day.
10. Percocet for back pain.

*****

Physical Examination:

Vital Signs: Weight: 295 lbs. Blood pressure is 140/80.  Her rhythm is regular at 80 bpm.

*****

40

Assessment and Plan: I do not have any recent lab studies to review.  It has been four years since she has done a Holter monitor for us to reassess her atrial arrhythmias.  I have asked her to do that this year.

This is a 32-year-old with a background history of an atrial septal defect repair.  The major health issues though continue to be oriented towards some lifestyle components with her obesity, metabolic syndrome, glucose intolerance and hypertension all playing their roles.
The only testing I suggested today was a Holter monitor to reassess for recurrent atrial arrhythmias.  If they are not found on Holter monitoring, I will plan on seeing her back in one year[']s time for a clinic visit.

Tr. 377-378.

On October 29, 2008, Brindle had a Holter Monitor attached, which was

interpreted by Jeffrey Mandak, M.D., FACC.  He wrote:

Conclusions:
1) Holter monitor demonstrating sinus rhythm and sinus tachycardia.  No atrial flutter was seen.
2) The patient's symptoms of palpitations seemed to correlate with episodes of sinus tachycardia.  Some of these seemed to occur with only minimal exertion such as walking out from the office to the parking lot.

Tr. 376.

On March 18, 2009, Dr. Orange completed a form, titled Functional

Capacity Assessment, which was presumably created by Brindle's attorney.  Tr.

689- 693  Dr. Orange wrote that Brindle could occasionally lift up to 5 pounds

41

"due to arrhythmia, sinus tachycardia and hypertension and intolerance to pain

and fatigue." Tr. 689. He wrote that that she is only able to stand and/or walk

for less than 2 hours in an 8-hour workday "due to leg cramping/swelling and

numbness in legs and feet, these activities are not permitted for any length of

time." Id. Dr. Orange wrote that Brindle would only be able to sit for less than

2 hours in an 8-hour work day due because she "must sit with legs elevated 90

degrees to decrease swelling and slow fluid retention, must alternate positions

as well." Tr. 690. He checked "yes" in response to the question, "this patient

will sometimes need to lie down at unpredictable intervals during a work shift,"

and wrote a "minimum of 2 times." Id. Dr. Orange wrote that her ability to

push and pull is limited because "these activities place stress on the sternum

and undue pain at surgery side, I advised against these activities to a degree of

an infrequent basis at best." Id. Dr. Orange wrote that Brindle could never

climb, balance, stoop, kneel, crouch, crawl, bend or twist because Brindle's

"medicines cause dizziness, concentration issues, etc., elevated heart rates and

blood pressure are negatively affected with minimal exertion." Tr. 691. He

also wrote that Brindle should avoid all exposure to extreme cold, extreme heat,

42

wetness, humidity, fumes, odors, gases, and hazards.  Tr. 692.  He wrote that

she should avoid even moderate exposure to noise and vibration.  Id.  In

explanation, he wrote "These conditions are inappropriate [illegible] for a

patient with pre existing conditions such as: asthma, concentration inabilities,

obesity and sleep apnea which would be aggravated in these areas and in my

opinion would be a danger."  Id.  Dr. Orange checked "constantly" in response

to the questions, "how often is this patient's experience of pain or fatigue

sufficiently severe to interfere with attention and concentration."  Tr. 693.  He

estimated that she would be absent from work more than three times per month

due to her impairments.  Id.  In conclusion, he checked the box "no work" in

response to the question, "based on your patient's current restrictions, would

he/she be capable of:."  Id.

Brindle's first argument is that ALJ Train erred by failing to accord significant

weight to the opinions of Drs. Walsh, Nguyen and Orange.   Most of what Brindle

argues the ALJ should have given more weight to is the repeated assertions of all

three physicians in which they all conclude that Brindle is unable to work.   While is it

is noteworthy, and persuasive to point out that the three physicians have repeatedly

stated that they do not believe that Brindle is able to work, it is well settled in this

circuit that "[t]he ultimate decision concerning the disability of a claimant is reserved

for the Commissioner." Knepp v. Apfel, 204 F.3d 78, 85 (3d Cir. Pa. 2000), citing

20 C.F.R. § 404.1527(e) (1999).   Examining sources are generally given more weight

than opinions from physicians who have not examined the claimant.  20 C.F.R. §

416.927(d)(1).   "**If []** a treating source's opinion on the issue of the nature and

severity of [a claimant's] impairments is well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the claimant's] case record, [it will be given] controlling

weight.  20 C.F.R. § 416.927(d)(2), (emphasis added).

   While Brindle's treating physicians paint her as a very sympathetic figure, one

deserving of an award of benefits, the objective medical evidence just is not consistent

with that picture.   While Brindle's subjective complaints indicate tachycardia and an

inability to sustain substantial gainful activity, the objective medical evidence just

does not indicate the same.  Consultative medical examiner, Dr. Brown, who has

examined Brindle three times since 2001, reflects the opinion of this non-medically

trained court, "[i]t is hard to understand  from a physician's standpoint how she can be

an active person up until 1998, and then have surgery that almost looks to be postoperative handicap relative to her heart when the heart function should have improved substantially." Tr. 279.  Prior to her ASD repair, Brindle was able to run 6 miles per day. Tr. 244.  Brindle appears to be well maintained on medication.  Tr. 261.  She has had 3 Holter Monitors performed.  The first, on December 21, 1998 (approximately 5 months post-operatively), showed sinus rhythm throughout. Tr. 257 and 261.  The second, on January 10, 2005 was "relatively unremarkable Holter monitor in a patient who reported numerous potential cardiac symptoms." Tr. 608. The third, on October 29, 2008, demonstrated sinus rhythm and sinus thachycardia. Tr. 376.  Her heart rate and blood pressure are consistently within normal ranges, with the exception of July 5, 2005, in which she had an elevated heart rate and blood pressure. Tr. 224, 244, 262, 271 and 377.  Her ejection fractions have been within normal ranges.  Tr. 198, 211, 216.

The limitations imposed by physicians working on behalf of the Social Security Administration, who did not examine Brindle are that she can lift up to 20-50 pounds, carry 10-25 pounds, stand and walk for about 6 hours and sit for about 6 hours per workday.  Tr. 233-240 and 656-657.

Case 4:11-cv-00176-WJN-GS   Document 15   Filed 01/31/12   Page 46 of 50

The most recent limitations imposed by Dr. Brown, who examined Brindle three times as a consultative medical examiner are frequent 2-3 pounds lifting and carrying, occasional lifting and carrying 20 pounds, standing and walking 4 hours per workday, and sitting for 6 hours.

The limitations imposed by Dr. Orange, Brindle's primary care physician, are the need for naps during the day, no sitting or standing for more than 15-20 minutes, no walking more than 150 feet at a time, and no lifting more than 5 pounds at a time. Tr. 268 , 272, 283 and 689.   Additionally, Dr. Nguyen stated that "can[]not respond appropriately to supervision, co-workers, and work pressures in a work setting." Tr. 271.

ALJ Train found that Brindle has the residual functional capacity to "perform sedentary work except that she cannot lift more than 5 pounds, she must alternate sitting and standing every 15-20 minutes, she is limited to walking 150 feet at a time, she is limited to simple repetitive (unskilled) work due to depression, anxiety, fatigue and pain, and she needs to utilize the bathroom every 1 to 1 ½ hours." Tr. 313.

The residual functional capacity found by the administrative law judge is supported by substantial evidence in the record.  It takes into account the limitations imposed by Brindle's treating physicians.  We do not find this to be error.

Next, Brindle argues that she needs to utilize the restroom every half-hour due to the frequent need to urinate. Tr. 707.  She followed up the hearing with an affidavit.  "I was [] wearing a protection (an absorbent pad) during the hearing." Tr. 477.  "The hearing lasted about 45 minutes."  Id.  "The protective pad was soaked with urine by the time I left the hearing and I left a small wet mark on the chair in the hearing room."  Id.  "I did not want to interrupt the Judge while he was talking to ask if I could go to the bathroom and [I] was unable to hold my bladder toward the end of the hearing."  Id.     There is no evidence in the record that she has ever complained to her physicians about her frequent need to urinate.   Moreover, in October 2005, Brindle denied urinary frequency. Tr. 641.   Because there is lack of evidentiary support in the record to back up Brindle's claim that she needs to utilize the restroom every half hour, it was not error for the administrative law judge to find the half hour claim to be not entirely credible.

Finally, Brindle argues that the administrative law judge erred by failing to

47

adequately consider the effects of her exogenous obesity and nonexertional limitations on her residual functional capacity to work.   There is no listing for obesity.   Thus, Social Security Ruling 02-1p directs that obesity is a medically determinable impairment, the effects of which should be considered when evaluating disability, including the claimant's residual functional capacity.   In assessing the effects of obesity on a claimant's residual functional capacity, an assessment should be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment.   SSR 02-1p.

The administrative law judge found that although Brindle alleged very restricted activities of daily living (no chores, the need to rest during even brief physical activity, and days spent watching television), the benign clinical findings and limited degree of treatment required belie such restricted activities.   Moreover, the residual functional capacity assessment made by the administrative law judge includes Brindle's limitations from her exogenous obesity.   The limit on walking more than 150 feet at a time and the limit to unskilled work due to fatigue is directly related to the effects of obesity, and the impairments that derive from the obesity (the sleep apnea and diabetes mellitus), rather than the effects of her other severe impairments.

48

Therefore, we find that the administrative law judge did not err.

**CONCLUSION:**

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner denying Brindle supplemental security income benefits.

An appropriate order will be entered.

Therefore, we find that the administrative law judge did not err.

**CONCLUSION:**

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner denying Brindle supplemental security income benefits.

An appropriate order will be entered.

Date: January 31, 2012

**United States District Judge**

49